## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH META PLATFORMS, INC. ACCOUNT IDENTIFIER TOMMY.DUARTE.351 (100011585795797) THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | No. 1:22-mj-00030-JCN<br><br>**FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Nicholas C. Rich, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I am a Special Agent with the U.S. Drug Enforcement Administration ("DEA"), and have been since 2008.  I previously worked as a police officer in Cape Elizabeth, Maine, from 2006 through 2008.  In my capacity as a DEA Special Agent, I have been assigned to investigate various violations of federal law, including, but not limited to, the investigation of narcotics, organized crime, and money laundering offenses.  I have conducted or participated in, among other things, surveillance, undercover transactions, the execution of search and arrest warrants, and debriefings of informants and confidential sources.  I have received specialized training in narcotics investigations and drug identification at the DEA Training Facility in Quantico, Virginia.  In connection with such investigations, I routinely utilize Internet-based informational sources, particularly social media platforms, to include Meta Platforms, Inc., more commonly known as "Facebook."[1]  Based on my experience and training, users of Facebook—including subjects of prior investigations in which I have participated—utilize Facebook's private chat application, Messenger, in furtherance of drug trafficking, and additionally post

---

[1]      On October 28, 2021, Facebook announced that it had changed its corporate name to "Meta Platforms, Inc."  Facebook (the social network) has kept its flagship domain name, however, so I refer to Facebook throughout this Affidavit for ease of reference.

1

details of themselves and their unlawful habits and activities on Facebook. I believe that to be

the case here with respect to TOMY MARCELO ORTEGA, who is presently the subject of a

DEA investigation into his potential violations of Title 21, United States Code, Sections

841(a)(1) (Drug Distribution) and 846 (Drug Conspiracy):



(Photograph obtained from Massachusetts Registry of Motor Vehicles.)

2.      More specifically, I make this Affidavit in support of an application for a search

warrant for information associated with a certain Facebook Username and Account Identifier

believed to be used by TOMY MARCELO ORTEGO **from August 1, 2020 through December**

**1, 2021**. My investigation has determined that, during this applicable time period, TOMY

MARCELO ORTEGA conspired to distribute, distributed, and aided and abetted in the

distribution of controlled substances in the District of Maine. The investigation has determined

that during the applicable time period, TOMY MARCELO ORTEGA communicated with other

drug traffickers via Facebook's Messenger application, and was active on the particular

Facebook account https://www.facebook.com/tommy.duarte.351, further identified by Facebook

account number 100011585795797, as user "Tommy OT Veneno," and in November 2021 used

Facebook to contact individuals involved with and/or connected with his trafficking activities.

3.       The information sought by this search warrant is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in **Attachment A**.  This Affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to require Facebook to disclose to the Government records and other information in its possession, pertaining to the subscribers or customers associated with the User Name and Account Identifier believed to be associated with TOMY MARCELO ORTEGA.  As detailed below, I believe that the Facebook Account Identifier https://www.facebook.com/tommy.duarte.351, further identified by Facebook account number 100011585795797, which presents publicly as user "Tommy OT Veneno," is associated with TOMY MARCELO ORTEGA.

4.       The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses, all of which I believe to be reliable.  This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.       Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) and 846, have been committed by TOMY MARCELO ORTEGA, and that evidence of the same will be present in his Facebook account.  There is probable cause to search the information described in **Attachment A**, as described in **Attachment B**.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

6.       I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

to require Facebook to disclose to the Government copies of the records and other information (including the content of communications) associated with the Account Identifiers described in **Attachment A**, particularly as described in Section I of **Attachment B**. Upon receipt of the information described in Section I of **Attachment B**, government-authorized persons will review that information to locate the items described in Section II of **Attachment B**.

## INVESTIGATION AND PROBABLE CAUSE

7.      I am presently investigating a matter involving the trafficking of fentanyl and heroin from Massachusetts and New Hampshire into the central Maine area by TOMY MARCELO ORTEGA and others from 2020 to the present. The period of time covered herein as to the search and seizure of the contents of the relevant Facebook account (August 1, 2020 through December 1, 2021) is narrower in scope, however, and limited to the period of time during which TOMY MARCELO ORTEGA, based on my investigation to date, is confirmed to have used the subject Facebook account.

8.      On about October 14, 2020, Kennebec County Sheriff's Office personnel conducted a traffic stop of a vehicle in Belgrade, Maine. The vehicle was searched roadside, leading to the seizure of controlled substances including fentanyl,[2] drug paraphernalia, and United States Currency. Chemical analysis testing later performed by the DEA Northeast Laboratory confirmed that the substance seized contained fentanyl with a total net weight in excess of 100 grams.

9.      Based on my training and experience, such a large quantity of fentanyl is consistent with illegal drug distribution and far in excess of that which would be possessed for an individual's personal use. To the contrary, fentanyl of this weight is more commonly divided

---

[2]      Fentanyl is a Schedule II controlled substance. It is listed in 21 U.S.C. § 841 by its specific name, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide.

4

into smaller assortments and sold for personal use, or mixed with other controlled substances like heroin, cocaine, methamphetamine, or MDMA, for re-sale.

10.     On the basis of the traffic stop referenced above, an individual who was a passenger in the vehicle was arrested and later charged federally with possession with intent to distribute controlled substances.  On February 2, 2021, this Cooperating Defendant ("CD-1") was interviewed by DEA Task Force Officer Michael Bickford and an Assistant United States Attorney for the District of Maine.[3]  On November 10, 2021, I conducted a second interview of CD-1 with an Assistant United States Attorney for the District of Maine.  I provide below information pertaining to TOMY MARCELO ORTEGA supplied by CD-1 during these interviews, as corroborated by certain business records and Facebook materials obtained in the course of my investigation.

    a.     In early 2020, CD-1 lived and worked in the central Maine area with Lionel Pelletier, who was known to CD-1 by the nickname "Trapper."

    b.     CD-1 accompanied Trapper on trips to Massachusetts to purchase fentanyl earlier in the summer of 2020.  Trapper was arrested on Maine state charges in about August 2020 in connection with drug trafficking.  Following Trapper's arrest, CD-1 began making the same trips to Massachusetts to procure fentanyl without Trapper, while Trapper remained in state custody.

---

[3]     CD-1 has a prior Maine state drug conspiracy conviction, in addition to CD-1's pending felony case in the U.S. District Court for the District of Maine.  CD-1 provided information pursuant to a standard proffer agreement conferring direct use immunity, and entered into plea and cooperation agreements with the Government, seeking to cooperate with the hope of receiving prosecutorial or judicial consideration for CD-1's pending charge.  CD-1 has been made no promises with respect to the outcome of CD-1's case.  The information provided by CD-1 has been corroborated and determined to be reliable.

c.  Beginning in about August 2020 and continuing until CD-1's arrest in about October 2020 following the traffic stop, CD-1 had an acquaintance ("Person-1") rent vehicles for CD-1 from an Enterprise Rent-A-Car location in the Lewiston-Auburn area so that the two of them (CD-1 and Person-1) could travel to the area of Haverhill, Massachusetts, to procure fentanyl from a drug dealer known to CD-1 as "T" (also known as "Tom").

d.  At least several times a week from about August 2020 through about October 2020, CD-1 and Person-1 travelled from Maine to the area of Haverhill, Massachusetts.  CD-1 went on approximately 100 such trips. On each trip, CD-1 would meet "T" in the parking lot of an apartment complex near Interstate 495.

e.  CD-1 described "T" as being a male, Dominican in appearance, and approximately 5 feet 10 inches tall.[4]  CD-1 described "T" as variously driving a white Mercedes-Benz SUV, a black Mercedes-Benz car, and a black Dodge pick-up truck, to their meetings.

f.  During each of their meetings, CD-1 exclusively met and transacted with "T."  Each time they met in the same parking lot.  There, CD-1 would provide "T" with between $7,000 to $10,000 or $11,000 in cash, with approximately $10,000 buying 275 grams of fentanyl.  At each meeting, CD-1 would hand "T" cash in the parking lot, and in exchange "T" would

---

[4]     TOMY MARCELO ORTEGA is listed in the records of the Massachusetts Registry of Motor Vehicles as being 5 feet 9 inches tall.  According to information I have obtained from immigration authorities, including U.S. Immigration and Customs Enforcement, TOMY MARCELO ORTEGA is a citizen of the Dominican Republic and was admitted to the United States as a Lawful Permanent Resident upon a petition by his mother, Norys Ortega.

provide CD-1 with fentanyl.  At the conclusion of each meeting, CD-1 would return to Maine to distribute the fentanyl that CD-1 had purchased from "T."

g.       The fentanyl seized on about October 14, 2020, by the Kennebec County Sheriff's Office had been supplied by "T" earlier that day.

h.       Following CD-1's arrest, CD-1 was detained in a county jail in Maine, and learned that other inmates were also familiar with "T"  providing drugs to dealers in central Maine, and also traveling to Maine to traffic drugs.

11.      In follow-up to the information provided by CD-1, I obtained and reviewed business records provided by EAN Holdings, LLC.  My review of these business records indicated that between about September 24 and through about October 15, 2020, Person-1 rented a vehicle from the Auburn, Maine, location of Enterprise Rent-A-Car.[5]  The rental vehicle was registered in Florida with the license plate JJWB50.

12.      In further follow-up to the information provided by CD-1, I obtained and reviewed business records provided by the New Hampshire E-ZPass system.  My review of these business records indicated that between about September 26 and through about October 14, 2020, the Florida-registered rental vehicle with the license plate JJWB50 travelled through the Hampton Toll Plaza on Interstate 95 in New Hampshire on eight dates, as shown below:

---

[5] I know from my prior investigations, experience, and review of publicly available materials that EAN Holdings does business as Enterprise Rent-A-Car.

| | PLATE | PLAZA | LANE | DATE | TIME |
|---|---|---|---|---|---|
| 1 | JJWB50 | HAMPTON MAIN | N57 | 10/14/2020 | 1:32:27 |
| 2 | JJWB50 | HAMPTON MAIN | S67 | 10/14/2020 | 0:36:33 |
| 3 | JJWB50 | HAMPTON MAIN | N57 | 10/11/2020 | 0:37:12 |
| 4 | JJWB50 | HAMPTON MAIN | S67 | 10/10/2020 | 23:19:57 |
| 5 | JJWB50 | HAMPTON MAIN | N4 | 10/8/2020 | 21:11:10 |
| 6 | JJWB50 | HAMPTON MAIN | N4 | 10/5/2020 | 23:55:31 |
| 7 | JJWB50 | HAMPTON MAIN | S4 | 10/5/2020 | 22:28:19 |
| 8 | JJWB50 | HAMPTON MAIN | N4 | 9/30/2020 | 22:32:01 |
| 9 | JJWB50 | HAMPTON MAIN | S67 | 9/30/2020 | 21:05:39 |
| 10 | JJWB50 | HAMPTON MAIN | N4 | 9/28/2020 | 2:14:36 |
| 11 | JJWB50 | HAMPTON MAIN | S68 | 9/28/2020 | 1:16:21 |
| 12 | JJWB50 | HAMPTON MAIN | N4 | 9/26/2020 | 22:54:12 |
| 13 | JJWB50 | HAMPTON MAIN | N4 | 9/26/2020 | 2:05:00 |

Based on my training and experience, the above toll activity corroborates and is consistent with CD-1's information regarding CD-1's drug transactions with "T." For example, with a few exceptions, the vehicle travels southbound initially before returning north through the same toll. Additionally, each round trip is of a short duration (*see* 9/28/2020, 9/30/2020, 10/5/2020, 10/10/2020 into 10/11/2020, and 10/14/2020). These patterns, based on my training and experience, are indicative of drug resupply or "re-up" trips.

13.     During my November 10, 2021, interview of CD-1, CD-1 referenced having contact with "T" on Facebook during the fall of 2020. Specifically, that "T" had reached out to CD-1 and told CD-1 to call him "Tomy." CD-1 additionally stated that "T" had reached out to another acquaintance of CD-1's ("Person-2") via Facebook Messenger in 2020 as well as more recently in 2021. During the interview, CD-1 positively identified a screenshot I took of a Facebook account presenting publicly as the user "Tommy OT Veneno" at Account Identifier https://www.facebook.com/tommy.duarte.351. CD-1 confirmed that the user "Tommy OT Veneno" was the individual known to him as "T," and that Account Identifier https://www.facebook.com/tommy.duarte.351 linked to the Facebook account of "T."

14.     In furtherance of my investigation certified business records were obtained from Facebook specific to the Account Identifier https://www.facebook.com/tommy.duarte.351, further identified by Facebook account number 100011585795797, which presents publicly as user "Tommy OT Veneno."

15.     The Facebook business records contained login and log out activity showing active use of the account throughout 2020 and 2021.  The records also showed that seven phone numbers had been provided by the subscriber, all of which were verified:[6] (646) 945-2724; (978) 204-9158; (603) 818-6060; (857) 204-9627; (978) 390-0329; (978) 590-1557; (978) 390-7530. According to a query of CLEAR, a database I consider to be a reliable source of information for law enforcement purposes, three of these numbers ((646) 945-2724, (978) 390-0329, and (603) 818-6060) return as associated with TOMY MARCELO ORTEGA.  Based on my training and experience, drug traffickers frequently use or maintain multiple cell phone numbers in order to avoid detection, monitoring, and surveillance by law enforcement, often doing so by using contact information associated with family or friends.

16.     Based on open source Internet research I also located a second account appearing to have been held by TOMY MARCELO ORTEGA, bearing Account Identifier https://www.facebook.com/tommy.veneno.5, further identified by Facebook account number 100036020604369, and presenting publicly as user "Tommy Veneno."  Facebook business records were obtained for this account.  Login and log out activity indicates that the account ceased to be used as of early 2020, suggesting that the "Tommy OT Veneno"

---

[6] According to Facebook, "verified" indicates the account holder responded to a text sent to the listed phone number.

https://www.facebook.com/tommy.duarte.351 account served as TOMY MARCELO

ORTEGA's primary Facebook account.[7]

17.    I additionally obtained consent from CD-1 to access CD-1's Facebook account.

After doing so, I located communications between the "Tommy OT Veneno"

https://www.facebook.com/tommy.duarte.351 account and CD-1, subsequent to CD-1's arrest on

Maine state drug trafficking charges in about October 2020, shown in the below screen shot.

These images indicate that on November 11, 2020, at 9:45 p.m., TOMY MARCELO ORTEGA

sent a message to CD-1, and attempted to call CD-1 using Facebook Messenger on November

24, 2020, at 2:18 a.m.



---

[7]      This account contains a registered email address of doublet489@gmail.com. I reviewed business records obtained from Google pertaining to this doublet489@gmail.com email account, which list the registered account user as "Tomy Marcelo" and provide an account recovery and verification phone number of (978) 590-1557. As detailed above, this (978) 590-1557 phone number is one of the seven cell phone numbers verified as linked to the https://www.facebook.com/tommy.duarte.351 "Tommy OT Veneno" Facebook account. I further reviewed business records obtained from T-Mobile showing the subscriber information for the (978) 590-1557 phone number. The T-Mobile records indicate that Norys Ortega, TOMY MARCELO ORTEGA's mother, is the subscriber.

18.     On about December 1, 2021, I met with and interviewed Person-2. During the interview, Person-2 showed me Facebook Messenger chats containing conversations with the "Tommy OT Veneno" https://www.facebook.com/tommy.duarte.351 account in 2020 and 2021. Specifically, as shown by the below screen shots, the conversations indicate that TOMY MARCELO ORTEGA contacted Person-2 on November 11, 2020, three minutes after he contacted CD-1, asking, "You [CD-1] girl?" On November 24, 2020, at 2:18 a.m.—the same date and time he attempted to call CD-1—TOMY MARCELO ORTEGA also attempted to call Person-2 using Facebook Messenger. When Person-2 responded later that same day, TOMY MARCELO ORTEGA wrote, "I'm he's friend of mass you don't remember me," followed by, "What happened to him in court?"



In connection with the information I have learned through my investigation, including with respect to CD-1's trips with Person-1 to Massachusetts to purchase drugs from TOMY MARCELO ORTEGA, I believe that TOMY MARCELO ORTEGA mistakenly contacted Person-2 via Facebook Messenger believing Person-2 to be Person-1 ("You [CD-1] girl?").[8]  I further believe that with his next statement ("I'm he's friend of mass you don't remember me") TOMY MARCELO ORTEGA was telling Person-2 that he was CD-1's friend who was from Massachusetts, by which TOMY MARCELO ORTEGA meant that he was CD-1's supplier on the numerous drug trips to Massachusetts.  TOMY MARCELO ORTEGA ended by asking Person-2 (whom he continued to mistake for Person-1) whether she remembered him from CD-1's and Person-1's prior resupply trips to Massachusetts.  I further believe that with his next statement ("What happened to him in court?"), TOMY MARCELO ORTEGA showed an awareness that CD-1 (to whom he had been supplying substantial amounts of fentanyl) was facing criminal charges in connection with offense conduct also implicating TOMY MARCELO ORTEGA, and that TOMY MARCELO ORTEGA was therefore inquiring about CD-1's charges out of self-interest and potentially to dissuade CD-1 from cooperating with law enforcement.

19.     The Facebook Messenger conversation on November 24, 2020, continued between TOMY MARCELO ORTEGA and Person-2 into November 25, 2020, as shown by the below screen shots:

---

[8]      Both Person-1 and Person-2 are females.

12



As detailed above, on November 25, 2020, TOMY MARCELO ORTEGA messaged Person-2 ("???"), which I believe shows his continued efforts to determine the status of CD-1's criminal case and his own potential criminal exposure. After Person-2 clarifies that she was not Person-1 ("You're thinking of [Person-1] I wasn't with him for a while I never met u"), TOMY MARCELO ORTEGA continues to indicate he wants to contact CD-1 ("Ima give you my # I want to Tto him"). On November 27 and 28, 2020, TOMY MARCELO ORTEGA provides Person-2 with a phone number for CD-1 to use to contact him. From my interview of Person-2, however, I understand that Person-2 did not convey this message to CD-1.

20.     As further detailed above, approximately one year later, on December 1, 2021, TOMY MARCELO ORTEGA again messaged Person-2, asking, "Hey you don't have contact wit [CD-1]?"[9]  Person-2 responded, but TOMY MARCELO ORTEGA did not further reply.

21.     In the interim period of time between the above Facebook Messenger exchanges TOMY MARCELO ORTEGA had with CD-1 and Person-2, I further believe that TOMY MARCELO ORTEGA continued supplying fentanyl and aiding and abetting the distribution of fentanyl in Maine.

22.     With respect to TOMY MARCELO ORTEGA's continued drug trafficking in 2021, I have reviewed and rely on the reports of DEA Task Force Officer Sean Wilton, who was involved in a June 14, 2021, traffic stop in the Portsmouth, New Hampshire, area that led to the arrests of a Maine resident for fentanyl trafficking as well as the seizure from TOMY MARCELO ORTEGA of over $6,000.00 in United States Currency.  From Task Force Officer Wilton's report I understand as follows, in sum and substance:

a.     On the evening of June 14, 2021, DEA personnel surveilled an individual known to be a local drug trafficker drive southbound on Interstate 95 from Auburn, Maine, and exit in Haverhill, Massachusetts, ending there in the parking lot of an apartment building complex.

b.     While the individual waited in the parking lot, a dark colored Dodge pick-up truck entered the area.  The individual then entered his vehicle and drove out of the parking lot, with the dark colored Dodge pick-up truck following close behind.

---

[9]     This particular exchange is only detailed by reference to the time of the day on December 1, 2020, rather than the time and date, because Person-2 provided the referenced screen shots to the DEA on the same day Person-2 received them and was interviewed (December 1, 2021).

c.     At approximately 10:31 p.m., both vehicles were seen pulling into the Interstate 95 northbound rest area in Seabrook, New Hampshire. The individual was seen exiting his vehicle and meeting with the dark colored Dodge pick-up truck.   At approximately 10:35 p.m., the individual's vehicle was seen leaving the rest area and getting back onto Interstate 95 northbound. The dark colored Dodge pick-up truck departed moments later.

d.     At approximately 10:45 p.m., a New Hampshire State Police Mobile Enforcement Unit performed a motor vehicle stop on the individual's vehicle for defective equipment.  The dark colored Dodge pick-up truck then pulled into the right break down lane and came to a complete stop on the side on Interstate 95, remaining there for one or two minutes before getting back into traffic and exiting the highway.  Another New Hampshire State Police Mobile Enforcement Unit then performed a motor vehicle stop on the truck as it turned onto Grafton Road in Portsmouth, New Hampshire.

e.     The operator of the truck was identified by his Massachusetts Driver's License as TOMY MARCELO ORTEGA.  During a consent search of his vehicle, approximately $6,000 in United States Currency was located in the center console.  The currency consisted of small denominations consistently seen with narcotics trafficking, and therefore was seized and later transferred to the custody of the DEA.  TOMY MARCELO ORTEGA was then released from the scene.

   f.  A search of the other individual's car revealed approximately 495 grams of fentanyl hidden behind the plastic wall of a console within the vehicle.

 23. On the basis of the foregoing, I accordingly believe that the search of the referenced Facebook account will contain evidence of TOMY MARCELO ORTEGA's violations of Title 21, specifically, of his conspiracy to distribute, distribution, and aiding and abetting in the distribution of controlled substances.  My belief is based on my training and experience as well as my investigation to date, which includes but is not limited to the statements and information provided by the confidential sources noted herein; the referenced business records corroborating such statements and information; November 2020 contact between the https://www.facebook.com/tommy.duarte.351 "Tommy OT Veneno" account and CD-1; November 2020 and November/December 2021 contact between the https://www.facebook.com/tommy.duarte.351 "Tommy OT Veneno" account and Person-2; and the Facebook subscriber records showing that the  https://www.facebook.com/tommy.duarte.351 "Tommy OT Veneno" was active throughout 2020 until the end of 2021.

 24. More particularly to Facebook, the company owns and operates a free-access social networking website of the same name that can be accessed at https://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

 25. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical

address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

26.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

27.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

28.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations

to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

29.    Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

30.    Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

31.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

32.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as

webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

33.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

34.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

35.    Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

36.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

37.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

38.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date),

the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

39.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.[10] Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and

---

[10]     This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.

Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

40.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## CONCLUSION

41.     Based on the foregoing, I request that the Court issue the proposed search warrant.

42.     On November 15, 2021, the United States Attorney's Office requested pursuant to Title 18, United States Code, Section 2703(f), the preservation of all stored communications, records, and other evidence in Facebook's possession regarding the account at issue.  Facebook confirmed via email that same day that it had taken reasonable steps to preserve the account requested, providing reference case number 6540795.  On February 11, 2022, the United States Attorney's Office requested and received from Facebook an extended preservation period for an additional 90 days.  In addition, I have confirmed via Internet searches that portions of the Facebook account remain publicly viewable.  I therefore believe that the evidence sought is presently available and maintained by Facebook.

43.    The Government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, and Facebook will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

44.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

45.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Dated at Bangor, Maine,
this 28th day of February, 2022.


Nicholas C. Rich
Special Agent
U.S. Drug Enforcement Administration


Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date:    **Mar 01 2022**

City and state:    Bangor, ME

John C Nivison U.S. Magistrate Judge
*Printed name and title*